## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| THOMAS A. COYNE, ET AL.,<br>          Plaintiffs,<br><br>          v.<br><br>GENERAL ELECTRIC COMPANY, ET<br>AL.,<br>          Defendants. | NO. 08cv1135 (SRU) |

### RULING ON MOTION TO DISMISS

Plaintiffs brought this securities fraud class action suit alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a *et seq.*, and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5(b).  Defendants General Electric Company ("GE" or "the Company"), Jeffrey R. Immelt, and Keith S. Sherin filed a motion to dismiss (**doc. # 60**) pursuant to Fed. R. Civ. P. 12(b)(6) and 15 U.S.C. § 78u-4(b)(3)(A).  For the reasons discussed below, I **GRANT** defendants' motion to dismiss.

### I.    Background

In 2008, plaintiffs filed several complaints against the defendants alleging violations of the Exchange Act.  I granted a motion for consolidation of those cases and for appointment of lead plaintiffs and lead counsel on October 7, 2008, which established as lead plaintiffs the Inter-Local Pension Fund GCC/IBT and Macomb County Employees' Retirement System and approved their lawyers as lead counsel.

The lead plaintiffs bring this purported class action on behalf of a class of all persons and entities who purchased the common stock of GE between March 12, 2008 and April 10, 2008. (Compl. ¶ 1.)  General Electric Company is a New York corporation with its principal executive

office in Fairfield, Connecticut.  GE operates as an energy, technology, media, industrial, consumer and financial services company worldwide.  (Compl. ¶ 39.)  During the class period, GE's Chief Executive Officer ("CEO") was Jeffrey I. Immelt and its Chief Financial Officer ("CFO") was Keith S. Sherin.  (Compl. ¶¶ 1, 3, 20, 40, 41.)  The factual incident giving rise to the present litigation was GE's substantial earnings miss for the first quarter of 2008 ("1Q08"). (Compl. ¶ 2.)

Lead plaintiff, Inter-Local Pension Fund GCC/IBT ("Inter-Local"), purchased GE securities during the class period.  (Compl. ¶ 37.)  Lead plaintiff, Macomb County Employees' Retirement System ("Macomb County"), also purchased GE securities during the Class Period. (Compl. ¶ 38.)

The complaint specifically alleges various statements by Immelt and Sherin on behalf of GE from before, during, and after the class period, which the plaintiffs claim under various theories constitute fraud.  First, at GE's annual Investor Outlook Conference on December 11, 2007, Immelt stated:

> So in the end, how do you think about next year?  How do you think about guidance?  This is what I would say is that this is the first time we've given guidance for 2008.  So in a fluid environment, with a lot going on, what I really want to give investors is a sense that 10% is in the bag.  You can do this.

(Compl. ¶¶ 6, 70 (emphasis removed)[1]; *see also* Def. Mot. to Dismiss, doc. # 60, Ex. A at 10.) Later in the conference, Immelt stated that a 10% earnings increase was the minimum for 2008. (Compl. ¶ 71.)  On January 18, 2008, GE issued a press release reporting results for the fourth

---

[1] Generally, although the Complaint added emphasis to quoted material, the emphasis has been removed if quotes from the Complaint or underlying documents are reproduced here.

quarter of 2007 and fiscal year 2007.  In the press release, GE re-affirmed the Company's 2008 earnings per share ("EPS") guidance of at least $2.42, which represented a 10% increase over 2007.  Immelt also provided 1Q08 EPS guidance, stating that "[f]or 1Q'08, we expect to achieve continuing EPS of $.50-.53," also up 10% over the first quarter of 2007.  Later, on January 18, 2008, during GE's fourth quarter 2007 earnings call, Immelt reassured investors about GE's 2008 guidance, stating that "I think our 2008 guidance is solid."  (Compl. ¶ 8.)  In that call, Immelt and Sherin stated:  "revenues still look to be on track, EPS is at least 10% or more"; "We're very well-positioned to grow earnings 10% plus in 2008"; and "We know what the environment that we're in in 2008 is and we expect solid growth in 2008 as well."  (Compl. ¶ 83.)

The class period begins on March 12, 2008.  On that date GE issued its 2007 Annual Report to shareholders, titled "Invest and Deliver Every Day."  (Compl. ¶ 94.)  It included a "Letter to Investors" signed by Immelt.  (Compl. ¶ 9.)  Under a sub-heading "Invest and Deliver," Immelt wrote:  "In 2008, we should hit all of our financial goals and outperform the S&P 500. Our revenues should grow by at least 10% to $195 billion, with organic revenue growth at 2 to 3 times GDP growth.  Our earnings per share should grow by at least 10%."  (Compl. ¶¶ 10, 95.)

On March 13, 2008, Immelt participated in an "interactive webcast" to discuss the 2007 Annual Report and GE's outlook for 2008.  The complaint alleges that a video lead-in to the webcast included previously-filmed footage arranged to appear as if it were part of the same event – the interview with Immelt.  It included footage of a CNBC reporter, Joe Kernan, reporting as follows:  "Our parent company General Electric looking for profits to rise at least 10% in 2008 vs. an S&P forecast of just 5 to 6.  Chairman and CEO Jeff Immelt's direct quote on

the wire '10% is in the bag.  We can do this.'"  (Compl. ¶¶ 12-14.)[2]

      During the webcast, in response to a question about the outlook for GE's stock price, Immelt again reaffirmed prior guidance and stated that "delivering financial results, hitting 10% EPS growth, getting $2.42 a share or greater . . . is what we believe and what we're committed to do this year, and what we are on track to do this year."  When asked again about making or exceeding the 1Q08 EPS target, Immelt stated that '[b]ased on what we see today, [there is] no reason to back away from that in '08.'"  (Compl. ¶¶ 15, 103.)

      GE Healthcare operates a unit called OEC that creates medical imaging products.  For a period of time encompassing the class period, the United States Food and Drug Administration ("FDA") did not permit GE OEC to ship those products.  (Compl. ¶¶ 74-75.)  In January 2007, GE entered a consent decree with the FDA that prohibited the manufacture and distribution of those products pending GE's compliance with FDA requirements.  (Compl. ¶ 76.)  On January 18, 2008, Sherin discussed GE OEC's product shipments, stating that "[f]or Q1 we do plan to ship about $50 million of OEC product . . .  OEC we're looking forward to shipping in the first quarter."  (Compl. ¶ 84.)  The complaint alleges that Immelt and Sherin knew on March 12, 2008, that GE OEC had not shipped during 1Q08.  (Compl. ¶ 122.)  The complaint further alleges that the Company had failed "to ship . . . products in the first quarter – even though defendants had said they were, in fact, shipping the products in the first quarter."  (Compl. 30.)

      The class period closes April 11, 2008, the date the Company announced its 1Q08 results.

---

[2]  Although a transcript of the webcast was submitted to the court by defendants as an exhibit to their Motion to Dismiss, the court did not have a transcript of the entire "video lead-in" quoted here.  At the time this opinion issued, the March 13, 2008 webcast was still available online:  http://www.ge.com/ar2007/video_pop_archive.htm.

On that day, GE disclosed that the Company suffered double-digit decreases in results at its

Commercial Finance, GE Money, Healthcare and Industrial divisions.  (Compl. ¶ 17.)  Rather

than reporting a 1Q08 EPS of $0.50-0.53 and improving on first quarter 2007 results by 10% or

more, GE reported a significantly lower 1Q08 EPS of $0.43, down 2% from first quarter 2007.

Immelt stated, "[W]e failed to meet our expectations.  Our primary shortfall was a decline in

financial services earnings.  We knew the first quarter was going to be challenging, but the

extraordinary disruption in the capital markets in March affected our ability to complete asset

sales and resulted in higher mark-to-market losses and impairments . . . .  Our inability to

complete these asset sales and higher mark-to-market losses and impairments impacted earnings

by $.05 per share versus plan."  (Compl. ¶ 18.)

Immelt announced that the Company also lowered its EPS guidance for full-year 2008

from $2.42 to $2.20-$2.30 and cut GE's growth estimate from 5%-10% to 0%-5%.  (Compl. ¶

19.)  On the 1Q08 earnings call with analysts that same day, Immelt and Sherin attempted to

explain the results.  Immelt stated:  "We missed our guidance, primarily, but not solely driven, by

financial services. . . .  If you look at the first quarter, there is really three basic things that I

would go through.  First, what happened versus guidance. . . . Healthcare, because OEC didn't

ship and C&I had a very challenging appliance market also created headwinds."  (Compl. ¶ 20.)

In response to an analyst's question about Immelt's reassurances regarding the 2008

guidance just a few weeks earlier, Immelt admitted that a week before the March 13, 2008

webcast, he "had a chance to review in some detail what the businesses were doing.  At that point

in time, we still felt like we were on track for the quarter and for the year."  (Compl. ¶ 21.)  In an

interview later that day, Sherin stated that "[w]e knew we had risks in the middle of March . . .

-5-

but we also had action plans and activities that if things went our way, we would have been in our guidance.  And in the end, not much went our way after the middle of March."  (Compl. ¶ 22.)

Immediately following the announcement on April 11, 2008, GE's stock fell $4.70 per share from $36.75 per share to close at $32.05 per share on volume of over 366 million shares. The decline represented a 13% drop and resulted in a $47 billion decline in market value. (Compl. ¶ 23.)  Negative press coverage and negative analyst reactions followed.  (Compl. ¶¶ 24-25.)

The complaint alleges that the defendants had knowledge that their statements were false or acted recklessly.  Specifically, the complaint alleges that each of the individual defendants was "privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith."  (Compl. ¶ 43.)

The complaint alleges that between 2001, when he took office, and 2008, the dates at issue, Immelt struggled to match the success GE achieved under its prior CEO, Jack Welch. (Compl. ¶¶ 48-57.)  It alleges that in 2003, GE's Board of Directors changed Immelt's compensation to tie it to the S&P 500.  (Compl. ¶ 55.)  Finally, it alleges the defendants had access to real-time financial and customer sales information about the Company through an analytical tool called the "Digital Cockpit."  (Compl. at 21-22 ¶¶ 63-69.)

## II.    Standard of Review

In considering a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss a complaint

brought under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), I must

"accept all factual allegations in the complaint as true," and "consider the complaint in its

entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions

to dismiss, in particular, documents incorporated into the complaint by reference, and matters of

which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

308, 322 (2007); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)

(stating that on a motion to dismiss, a court may consider documents when "there was undisputed

notice to plaintiffs of their contents and they were integral to plaintiffs' claim"); *Malin v. XL

Capital Ltd.*, 499 F. Supp. 2d 117, 129 (D. Conn. 2007), *aff'd*, 312 Fed. Appx. 400 (2d Cir. Feb.

26, 2009) (stating the following materials may be considered: "(1) facts alleged in the complaint

and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the

complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents

or information contained in defendant's motion papers if plaintiff has knowledge or possession

of the material and relied on it in framing the complaint, (4) public disclosure documents

required by law to be, and that have been, filed with the Securities and Exchange Commission,

and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules

of Evidence.").

A complaint alleging securities fraud must satisfy the heightened pleading requirements

of the Private Securities Reform Litigation Act of 1995 ("PSLRA"), Pub. L. 104-67, 109 Stat.

737 (Dec. 22, 1995), and Federal Rule of Civil Procedure 9(b) by stating with particularity the

circumstances constituting fraud.  *Slayton v. American Exp. Co.*, 604 F.3d 758, 766 (2d Cir.

2010).  Accordingly, a complaint must "(1) specify the statements that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent."  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)

(citations omitted).

      The PSLRA imposes stringent procedural requirements on plaintiffs pursuing private

securities fraud actions.  First, the statute requires that, "[i]n any private action arising under this

chapter in which the plaintiff alleges that the defendant . . . made an untrue statement of a

material fact . . . or . . . omitted to state a material fact necessary in order to make the statements

made, in the light of the circumstances in which they were made, not misleading . . . the

complaint shall specify each statement alleged to have been misleading, the reason or reasons

why the statement is misleading, and, if an allegation regarding the statement or omission is

made on information and belief, the complaint shall state with particularity all facts on which that

belief is formed."  15 U.S.C. § 78u-4(b)(1).  Second, the statute requires that "the complaint

shall, with respect to each act or omission alleged to violate this chapter, state with particularity

facts giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. § 78u-4(b)(2).  PSLRA Section 21D(b)(3)(A) requires courts to dismiss complaints

that fail to meet the pleading requirements of paragraphs (b)(1) and (b)(2).  *See* 15 U.S.C. §

78u-4(b)(3)(A).

      The Second Circuit has held that plaintiffs may meet the heightened pleading standard

"by alleging facts that [constitute] strong circumstantial evidence of conscious misbehavior or

recklessness on the part of defendants."  *See Novak*, 216 F.3d at 308.  A securities fraud

complaint will survive a Rule 12(b)(6) motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

## III.   Discussion

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, prohibit fraudulent activities in connection with securities transactions.  Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5 implements Section 10(b) by declaring it unlawful

> [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .

17 C.F.R. § 240.10b-5(b).  In the Second Circuit, "to state a claim under Rule 10b-5, a plaintiff must allege that, in connection with the purchase or sale of securities, the defendant made material misstatements or omissions of material fact, with scienter, and that the plaintiff's reliance on the defendant's actions caused injury to the plaintiff."  *Slayton*, 604 F.3d at 765. "Materiality" is fulfilled if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted); *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010).

A.    No Actionable Misstatements or Omissions

The plaintiffs' complaint fails to state a plausible claim for relief because it alleges no

"untrue statement of a material fact" or omission of "a material fact necessary in order to make

the statements made, in the light of the circumstances under which they were made, not

misleading," as required by Rule 10b-5.  17 C.F.R. § 240.10b-5(b).

1.    *Statements About Projected Earnings "In the Bag"*

As shown by the documents in which the statements allegedly were made, defendants

never made the alleged misstatement that the plaintiffs most often raise in the complaint to

support their claim:  an "'in the bag' earnings promise for 1Q08." (Compl. ¶ 83.[3])  Rather, as the

complaint elsewhere admits, the statements defendants made predicting earnings were directed at

the entire fiscal year.  (Compl. ¶¶ 6, 7, 70.[4])  Defendants first used the phrase, "in the bag," in a

live conference in December 2007.[5]  (Compl. ¶ 6.)  That statement falls outside the class period

---

[3]  *See also* ¶ 2 (stating that defendants made "false assurance to investors that 10%
earnings growth for the [1Q08] quarter was 'in the bag'"), ¶ 101 ("Thus, on March 13, 2008,
defendants again stated that the 10% earnings growth for 1Q08 had already occurred and, in fact,
was 'in the bag.'"), ¶ 106 ("As of March 12, 2008, 10% earnings growth was not in the bag and
never would be in the bag.  GE was not achieving and could not achieve 10% earnings growth,
and, in fact was experiencing a decline in earnings for the quarter.")).

[4]  "In [Immelt's] forecast for 2008, he promised a minimum earnings improvement of at
least 10%, and likely higher."  (Compl. ¶ 6.)  "Yet while Immelt's '10% is in the bag' for 2008
comments were widely reported, including on GE's own CNBC business network, the stock
price still did not improve.  So at the next opportunity to address shareholders, Immelt again
stressed that the Company would achieve – at a minimum – an earnings increase of 10% for the
entire year."  (*Id.* ¶ 7.)  At the December 2007 conference, "Immelt offered guidance for 2008 for
the first time.  In great detail, he explained to investors that 10% earnings growth was the
minimum the Company would achieve."  (*Id.* ¶ 70.)

[5]  Immelt's statement in December 2007 was, "So in the end, how do you think about
next year? . . . . what I really want to give investors is a sense that 10% is in the bag."  (Compl. ¶
6.)

-10-

and, without more, is not actionable.  The "in the bag" statement was referenced once more, in a

webcast on March 13, 2008, during the class period.  (Compl. ¶¶ 12-14.)  The documents show

that both times, however, defendants used the term in reference to projected earnings growth for

the full year 2008; at no time did the defendants use the phrase in reference to 1Q08 earnings.[6]

2.    *Annual versus Quarterly Goals*

The complaint fails to fairly differentiate between GE's projected annual goals and its

projected quarterly goals.[7]  The complaint alleges that GE's failure to meet 1Q08 projections

caused a decline in stock value at the close of the class period and caused the plaintiffs harm.

The documents submitted by the plaintiff show that many statements have been

improperly attributed as referring to 1Q08 rather than the entire year.  For example, the complaint

claims:  "When asked again about making or exceeding the 1Q08 EPS target, Immelt stated that

'[b]ased on what we see today, [there is] no reason to back away from that in '08."  (Compl. ¶

15).  In context, Immelt was asked about having set 10% as a baseline for the year and he

responded, "[a]s a baseline and we still believe that that is in our sights for 2008."  He was asked,

"[t]here is no reason to back away from that for '08?"  He responded with the phrase quoted in

the complaint: "Based on what we see today, there is no reason to back away from that in '08."

(Def. Mot. to Dismiss, Ex. E at 4.)  The complaint stretches the defendants' statements beyond

---

[6]   Contrary to the characterization in the complaint (compl. ¶¶ 2, 83, 101, 106, quoted above), the documents do not show that GE used the phrase "in the bag" in relation to earnings for 1Q08, or any particular quarter, on January 18, 2008, or at any time.

[7]   Additionally, I note that the complaint sometimes misleads by citing the promised 10% earnings growth without referencing any time period:  "Having guaranteed investors and analysis that the Company would achieve 10% earnings growth – at a minimum – Immelt had painted himself into a corner.  In truth, 10% was not 'in the bag' and would never be."  (Compl. ¶ 80.)

their plain meaning.

Defendants' statements regarding goals for the year are not a plausible basis for liability. The March 12 annual report stated that "[i]n 2008, we should hit all of our financial goals . . .". (Compl. ¶¶ 10, 95.)  Plaintiffs ask the court to read "all of our financial goals" to include as an intermediate goal the 1Q08 earnings projections announced two months prior.  Plaintiffs characterize the March 13, 2008 webcast by saying "Immelt was given three opportunities to address the earnings promise and he whole-heartedly reiterated it every time."  (Compl. ¶ 103.) The March 12 statement, however, says nothing about 1Q08; it is a statement relating to the entire fiscal year 2008.  Likewise, the March 13 webcast address earnings growth for the year, not the quarter.  At no point during the webcast were GE's 1Q08 projections referenced. Defendants' statements during the class period reflect a goal of 10% earnings growth for the year. Achieving that growth over the year does not require achieving 10% in the first quarter or in any particular quarter.  Defendants made no promise to hit every weekly, monthly, or quarterly goal.

### 3.    *No Actionable Omissions*

Plaintiffs have not alleged that defendants made actionable omissions during the class period.  A duty to correct applies when "a company makes a historical statement that at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not."  *IBM*, 163 F.3d at 109.  "Thus, if and when a speaker learns that a prior statement was misleading when made, a duty to correct arises."  *Id.*

"A duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event."  *Id.* at 110.  There is "no duty to update vague statements of optimism or expressions of opinion" and no need "to update when the original

statement was not forward looking and does not contain some factual representation that remains 'alive' in the minds of investors as a continuing representation, or if the original statements are not material." *Id.* (citations omitted.)

GE's only statements about projected 1Q08 earnings were made on January 18, 2008. Those statements of earnings projections for the quarter established goals at the start of the quarter and could not plausibly mislead. Thus, GE was under no duty to correct them during the quarter. Holding otherwise would lead to an absurd result, effectively imposing on GE a duty to inform investors constantly about the company's earnings throughout the quarter.

4.   *Medical Equipment*

The complaint mischaracterizes GE's statements regarding the shipment of medical equipment. The complaint alleges that the Company had failed "to ship . . . products in the first quarter – even though defendants had said they were, in fact, shipping the products in the first quarter." (Compl. 30.) The plaintiffs have failed to allege when and how the defendants said they were currently shipping products. Rather, the complaint and accompanying documents both show that the Company made statements merely anticipating that it would ship products in the first quarter. The complaint shows that shipment during the first quarter was a target rather than a reality. Describing a December 11, 2007 conference, the complaint states: "Analysts understood Immelt's statements about healthcare to mean GE would be able to begin shipment again on these important products, as the slide he presented for this part of the presentation states 'OEC targeting shipment in 1Q.'" (Compl. ¶ 78, *see also* ¶ 70.) As the complaint reflects, in a January 18, 2008 Conference Call, Sherin discussed GE OEC's product shipments and stated "[f]or Q1 we do plan to ship about $50 million of OEC product . . .  OEC we're looking forward

to shipping in the first quarter" and "we feel like we're on track to execute on what we committed to at OEC." (Compl. ¶¶ 84, 86.) The complaint alleges that Immelt and Sherin knew on March 12, 2008, that GE OEC had not shipped during 1Q08 (compl. ¶ 122), but that is not the same as Immelt or Sherin stating that the products had shipped or that they were currently shipping.

More importantly, there is no indication that GE knew it wouldn't ship OEC product in the first quarter or that it wouldn't make its projected goal without completing some shipments. Allegations of the defendants state of mind are discussed in greater detail below, but it is important to note what the complaint does not say about OEC shipments. The complaint states that GE knew that it "was not able to sell its GE OEC products." (Compl. ¶ 106(e).) But the complaint does not state that the defendants knew, on or before March 12, 2008, that the FDA would not grant approval before the end of quarter, prohibiting GE from shipping OEC products and preventing their expected positive impact on 1Q08 results.

The complaint states only that GE OEC knew, based on the FDA's own 510(k) guidance, that they would not receive a decision on whether or not they could even market GE's OEC products for at least 90 days thereafter – or some time after March 16, 2008." (Compl. ¶ 123.) A causal relationship between the fact that the goal for 1Q08 was not achieved and that OEC shipment was not completed arises at most only in hindsight. Plaintiffs did not plead any facts suggesting that the defendants knew or should have known at the time of their statements that the products would not ship in time.

-14-

5.      *Other Inactionable Statements*

Plaintiffs quote other statements by defendants that are inactionable for other reasons, including: the statements were made outside the time period; they fall under the safe-harbor provisions of the PSLRA; they are accurate statements of historical fact; the statements are mere puffery or corporate optimism.

A defendant "is liable only for those statement made during the class period."  *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998) (hereinafter, "*IBM*") ("A defendant, however, is liable only for those statements made during the class period."). Statements made before the class period are relevant only "to confirm what a defendant should have known during the class period."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

Regarding defendants' statements preceding the class period, the complaint alleges that the statements "were in the market, active and uncorrected at the beginning of the Class Period. With the exception of the analyst reports and periodicals quoted [in the complaint], all of the above statements were maintained and available on GE's website throughout the Class Period, at www.ge.com." (Compl. ¶ 93.)  Indeed, the statements are relevant to confirm what the defendants should have known during the class period, but the pre-class period statements do not form an independent basis for liability.  The class period is from March 12, 2008 through April 10, 2008.  Thus, GE's statements in December 2007 about expected 2008 earnings and its only projections about 1Q08 earnings, made on January 18, 2008, are both outside the class period. Plaintiffs do not allege that any pre-class period statements show that the defendants knew their later statements were false.  Neither can defendants be held liable for any statements made after

-15-

the class period ended.

The PSLRA provides a safe harbor for forward-looking statements.  Such statements are defined, in part, as those containing "a projection of revenues, income (including income loss), earnings (including earnings loss) . . . per share" (15 U.S.C. § 78u-5(i)(I)(1)(A)); "plans and objectives of management for future operations" (15 U.S.C. § 780-5(i)(1)(B)); or "future economic performance" (15 U.S.C. § 78u-5(i)(1)(C)).  A forward-looking statement cannot be the basis for Section 10(b) or Rule 10b-5 liability if either (a) it is identified as a forward-looking statement and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or (b) the plaintiff "fails to prove that the forward-looking statement (i) if made by a natural person, was . . . made with actual knowledge that the statement was false or misleading; or (ii) if made by a business entity, was made or approved by [an executive officer] with actual knowledge by that officer that the statement was false or misleading."   15 U.S.C. § 78u-5(c).

Plaintiffs alleged that the warnings defendants issued were "ineffective to shield those statements from liability" and that the defendants "also did not make or issue contemporaneous, meaningful, cautionary 'safe harbor' statements identifying important factors that could cause actual results or circumstances to differ materially from those in the forward-looking statement." (Compl. ¶ 140.)  The documents submitted show that cautionary statements did accompany forward-looking statements.  For example, the January 18, 2008 press release included a "Caution Concerning Forward-Looking Statement," which explained that the press release contained forward-looking statements that "by their nature address matters that are to different degrees uncertain."  (Def. Mot. to Dismiss, Ex. B, at 3-4.)  I need not test the muster of these

-16-

warnings because I find the plaintiffs have failed to allege the statements were made with "actual knowledge" that they were "false or misleading."

As discussed in detail below, plaintiffs have not alleged specific facts showing that the defendants' forward-looking statements regarding "all financial goals" and earnings projections for 1Q08 were made with "actual knowledge" that the statements were "false or misleading."

Accurate statements of historical fact are not misleading and thus are not actionable, *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004), and "[e]xpressions of puffery and corporate optimism do not give rise to securities violations, *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

      B.    <u>Failure to Plead Requisite Intent</u>

Even assuming the plaintiffs had identified an actionable statement or omission, in order to plead a securities fraud claim, the complaint must also allege that the defendants acted with scienter. *See Novak*, 216 F.3d at 306. "In a § 10(b) action, scienter refers to a mental state embracing intent to deceive, manipulate, or defraud." *Merck & Co., Inc. v. Reynolds*, 130 S. Ct. 1784, 1796 (2010) (citation and quotations omitted).

The Second Circuit has determined that the PSLRA adopted the "strong inference" standard previously followed by the Second Circuit: in order to plead scienter, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak*, 216 F.3d at 311.

In "determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. A complaint will survive "only if a reasonable person would deem the inference of scienter cogent

-17-

and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*
at 324.  The Supreme Court has stated that "unless a § 10(b) plaintiff can set forth facts in the
complaint showing that it is 'at least as likely as' not that the defendant acted with the relevant
knowledge or intent, the claim will fail."  *Merck & Co.*, 130 C. St. at 1796.

   "The requisite scienter can be established by alleging facts to show either (1) that
defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence
of conscious misbehavior or recklessness."  *ECA, Local 134 IBEW Joint Pension Trust of
Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  Prior case law in the
Second Circuit suggests that the inference may arise in at least four circumstances, "where the
complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way
from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had
access to information suggesting that their public statements were not accurate; or (4) failed to
check information they had a duty to monitor."  *Novak*, 216 F.3d at 311 (internal citations
omitted).  The second circumstance is not alleged.  Plaintiffs allege the inference arises because
the defendants benefitted from the fraud, knew their statements were inaccurate, and/or failed to
fulfill their duty to monitor information.

   Plaintiffs first allege the Immelt's statements were deliberately false and that he hoped to
benefit in a concrete and personal way by lying.  The plaintiff's theory is two-fold: first, that
Immelt was motived by a desire to meet or surpass the performance of former CEO Jack Welch;
and second that his incentive compensation was tied to GE's performance and his statements
caused stock prices to remain artificially high.  Scienter is not alleged, however, when plaintiffs
allege "motives possessed by virtually all corporate insiders, including: (1) the desire to maintain

-18-

a high corporate credit rating or otherwise sustain the appearance of corporate profitability, or of

the success of an investment; and (2) the desire to maintain a high stock price in order to increase

executive compensation, or prolong the benefits of holding corporate office." *Novak*, 216 F.3d at

307 (citations and quotations omitted).  Neither Immelt's alleged desire for GE to succeed, nor

his allege desire for his executive compensation to increase, are facts that raise a strong inference

of scienter.[8]  Nor have plaintiffs alleged that Sherin benefitted in a concrete and personal way

from his statements.  Thus, the alleged facts do not raise the requisite strong inference that

Immelt and Sherin expected a concrete and personal benefit and that the defendants acted with

scienter.

Next, although the complaint alleges Immelt and Sherin "knew facts or had access to

information," it does not allege any public statements during the class period that were not

accurate in light of that supposed information.  Rather, the complaint attempts to infer scienter,

that GE should have or must have known of lower earnings, by showing that GE's 2007 Annual

Report and its webcast interview occurred temporally proximate to the end of 1Q08.  Pleading

"fraud by hindsight" (i.e., showing that defendants made a statement and then showing in

hindsight that the statement is false) is impermissible.  "Corporate officials need not be

clairvoyant; they are only responsible for revealing those material facts reasonably available to

them."  *Novak*, 216 F.3d at 309.

---

[8]  More importantly, plaintiffs never explain how defendants benefitted in any way by
committing securities fraud over a four-week period, knowing that their fraud would be exposed
within weeks when GE announced its quarterly results.  *See Shields v. Citytrust Bancorp, Inc.*, 25
F.3d 1124, 1130 (2d Cir. 1994) ("It is hard to see what benefits accrue from a short respite from
an inevitable day of reckoning.  There is no claim here that false statements were made in an
effort to sell off shares held by management, or to delay a criminal prosecution.").

Finally, although the complaint alleges Immelt and Sherin "had a duty to monitor" information, it does not allege the defendants "failed" to do so before making any specific public statement.  Even if an inference of scienter is raised by the fact that Immelt and Sherin had access to information suggesting GE would fail to reach its goals, a reasonable person would not deem that inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged, such as the inference that Immelt and Sherin had other information suggesting GE still would reach its goals.

The plaintiffs' claim fails because, although they have alleged generally that the defendants were or should have been aware that GE would not make its first quarter earnings goal, they do not allege facts that raise a strong inference that defendants acted with scienter. The plaintiffs have made a conclusory allegation that does not raise a plausible claim that the defendants deliberately lied or committed fraud by using or failing to use information to mislead investors.

C.      Claims against Individual Defendants

As described above, the complaint fails to plead scienter as required under the PSLRA with regard to any defendant.  In particular, the complaint fails to allege a single statement by Sherin during the class period, nor does it allege that he controlled any person who is alleged to be liable under the Act.  The complaint against Sherin therefore fails.  *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) ("a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b).").

The complaint alleges that it is "appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that dissemination of the false, misleading and incomplete

information conveyed in the Company's public filings, press releases and other publications as alleged herein is the result of the collective actions of the narrowly defined group of defendants identified above." (Compl. ¶ 44.)  Although the Second Circuit has not yet confronted the issue, the Fifth Circuit has held that the group pleading doctrine does not survive the PSLRA because it conflicts with the PSLRA's requirements regarding pleading scienter and pleading with particularity.  *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 364 (5th Cir. 2004).  Regardless of whether the defendants are treated as a group, however, there were no actionable misstatements alleged and therefore no documents that may be attributed to any member of the group to make him liable.

In addition to liability under Section 10(b) or Rule 10b-5, plaintiffs allege liability under Section 20(a) of the Act, which establishes joint and several liability subject to a good faith exception for every person who, directly or indirectly, controls any person liable under any provision of the Act.  15 U.S.C. § 78t(a).  To state a claim under Secion 20(a), a plaintiff must allege: (1) a primary violation by the controlled person or entity; (2) "control of the primary violator by the targeted defendant"; and (3) "that the controlling person was in some meaningful sense a culpable participant in the fraud." *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (citations, quotations, and alterations omitted).  The claim fails on the first element because there have been insufficient allegations of a primary violation by any person.

## IV.   Conclusion

I have considered plaintiffs' remaining arguments and found them without merit.  For the reasons detailed above, the motion to dismiss (**doc. # 60**) is **GRANTED**.  The clerk shall enter judgment and close this case.

It is so ordered.

Dated at Bridgeport, Connecticut, this 15th day of July 2010.


                                        /s/ Stefan R. Underhill
                                    _____
                                          Stefan R. Underhill
                                          United States District Judge